IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| J."E."L., by and through their next friend, PATRICIA BYRNES; A."T."C., by and through his next friends, D.T. and P.T.; L.A., by and through her next friend, R.X.; E.M., by and through her next friend, C.M.; D.R.V., by and through her next friend, A.R.V.; J.C., by and through his next friend, C.C.; J.L.A., by and through his next friend, R.X.; J.S.A., by and through his next friend, R.X.; K.A., by and through her next friend, R.X.; and A.C., by and through her next friends, K.C. and R.C., each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | C.A. NO. 1:24-cv-471 |
| v. | ) | CLASS ACTION COMPLAINT |
| | ) | |
| RICHARD CHAREST, in his official capacity as Secretary of the EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES, and ASHLEY DECKERT, in her official capacity as Director of the DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**Contents**

CONTENTS ........................................................................................................................2

NATURE OF THE CASE ...................................................................................................3

JURISDCTION AND VENUE ...........................................................................................6

CLASS ALLEGATIONS ....................................................................................................7

PARTIES ...........................................................................................................................15

  I.  PLAINTIFFS ...........................................................................................................15

  II. DEFENDANTS ........................................................................................................37

STATEMENT OF FACTS .................................................................................................38

  I.  STATUTORY BACKGROUND ...............................................................................38

     *A. THE FEDERAL MEDICAID ACT AND THE EARLY AND PERIODIC SCREENING, DIAGNOSTIC, AND TREATMENT SERVICES ("EPSDT") PROVISIONS*...............38

     *B. THE ADA, THE INTEGRATION MANDATE, AND SECTION 504 OF THE REHABILITATION ACT* ...............................................................................................39

     *C. RHODE ISLAND'S MEDICAID PROGRAM* ...............................................................42

  II. PLAINTIFFS NEED INTENSIVE COMMUNITY-BASED BEHAVIORAL HEALTH SERVICES TO ADDRESS THEIR BEHAVIORAL HEALTH NEEDS WITHOUT RESORTING TO HOSPITALIZATION OR OTHER INSTITUTIONALIZATION. ........46

     *A. DEFENDANTS KNOW AND ADMIT THEY DO NOT ENSURE PLAINTIFFS' ACCESS TO INTENSIVE HOME AND COMMUNITY-BASED SERVICES.* ..............48

     *B. PLAINTIFFS LACK ACCESS TO INTENSIVE CARE COORDINATION.*...................51

     *C. PLAINTIFFS LACK ACCESS TO INTENSIVE IN-HOME BEHAVIORAL SERVICES.* ....................................................................................................................53

     *D. PLAINTIFFS LACK ACCESS TO MOBILE CRISIS SERVICES.*................................56

  III. DEFENDANTS' FAILURE TO PROVIDE PLAINTIFFS WITH INTENSIVE COMMUNITY-BASED BEHAVIORAL HEALTH SERVICES RESULTS IN UNNECESSARY INSTITUTIONALIZATION...................................................................58

  IV. ENSURING ACCESS TO INTENSIVE COMMUNITY-BASED BEHAVIORAL HEALTH TREATMENT IS NOT A FUNDAMENTAL ALTERATION TO RHODE ISLAND'S MEDICAID PROGRAM. ...............................................................................62

PRAYER FOR RELIEF .....................................................................................................65

## NATURE OF THE CASE

1.  Over the past decade, mental and behavioral health challenges among Rhode Island children and youth have steadily worsened. In 2022, 28.7% of Rhode Island children ages 3-17 were struggling with a mental, emotional, or behavioral health issue. The rate of Rhode Island high school students who report feeling sad or hopeless for more than two weeks per year has surged by 30% over the past decade. Suicidality has also steadily risen. In 2023, 9% of Rhode Island high school students reported attempting suicide at least once in the previous year. In 2024, an alarming 17% of high schoolers and 23% of middle schoolers seriously considered suicide, with these rates disproportionately higher among girls.

2.  In May 2022, Rhode Island mental health professionals sounded the alarm, declaring a "state of emergency" in child and adolescent mental health. Their declaration highlighted the "skyrocketing rates of depression, anxiety, trauma, and suicidality that will have lasting impacts on them, their families, and their communities." They underscored the "dramatic increases" in emergency department visits for mental health emergencies, and urged a concentrated effort to "invest in community-based, responsive outpatient care to identify and treat youth earlier in their mental health journeys." Early intervention, they emphasized, would alleviate pressure on families and reduce reliance on higher levels of care by preventing "full-blown mental health crises."

3.  Over 20,000 Rhode Island children and youth with behavioral health disabilities rely on Medicaid for critical behavioral health services. But despite the urgency and gravity of the crisis, the response has been woefully and consistently inadequate. As a result, hundreds of vulnerable young people continue to be denied timely access to the behavioral health services they desperately need and are entitled to under federal law.

4. This action follows years of glaring failures in Rhode Island's behavioral health system for children and youth. It seeks to remedy Rhode Island's long-standing and well-documented failure to provide or arrange for treatment for Medicaid-eligible children and youth with significant behavioral health needs.

5. Plaintiffs are Medicaid-eligible children and youth with a serious emotional disturbance ("SED"), including SED and co-occurring developmental disabilities ("DD"), who are being denied medically necessary Intensive Home and Community-Based Services required under the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the Medicaid Act. Without access to these crucial services, Plaintiffs are institutionalized in acute-care psychiatric hospitals or through prolonged placement in segregated congregate care settings such as group homes, psychiatric residential treatment facilities, and other residential treatment centers. The harmful effects of such restrictive environments on children and youth are widely recognized and well-documented.

6. Plaintiffs bring this action on behalf of themselves and all similarly situated children against Defendants Richard Charest, in his official capacity as Secretary of the Rhode Island Executive Office of Health and Human Services ("EOHHS"), and Ashley Deckert, in her official capacity as Director of the Rhode Island Department of Children, Youth and Families ("DCYF").

7. Federal law requires Defendants to arrange for and provide necessary behavioral health services to Plaintiffs in a timely manner. Specifically, under the EPSDT provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(4)(B), Defendants are required to provide or arrange for intensive home and community-based behavioral health services

(hereinafter "Intensive Home and Community-Based Services") for Medicaid-eligible children and youth who need them, including:

- <u>Intensive Care Coordination</u>: Case management and planning services facilitated by a child and family team, designed to coordinate and manage care across multiple systems.

- <u>Intensive In-Home Behavioral Services</u>: Individualized therapeutic interventions delivered in homes and other community settings on a frequent and consistent basis, aimed at improving behavior and preventing out-of-home placements.

- <u>Mobile Crisis Services</u>: 24/7 emergency services that respond to a child's acute mental health needs quickly, preventing unnecessary out-of-home placements or hospitalizations.

8.  Defendants are further required to ensure these Intensive Home and Community-Based Services are available to Medicaid-eligible children and youth "with reasonable promptness." 42 U.S.C. § 1396a(a)(8).

9.  By participating in the Medicaid program and accepting federal funding, Defendants chose to be bound by federal laws, including the Medicaid Act's EPSDT and "reasonable promptness" provisions. However, Defendants consistently fail to meet these requirements, denying Named Plaintiffs and members of the class timely access to critical Intensive Home and Community-Based Services, in violation of federal law. Defendants' ongoing failures only worsen the behavioral health crisis affecting Rhode Island children and youth.

10. Defendants' failure to provide Named Plaintiffs and members of the class with timely access to Intensive Home and Community-Based Services also violates the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act. Federal law requires

Defendants to provide Named Plaintiffs and members of the class treatment in the most integrated setting appropriate to their needs and prohibits discrimination on the basis of disability. Deprived of the medically necessary Intensive Home and Community-Based Services at issue here, Named Plaintiffs and members of the class have been and will be unnecessarily hospitalized and institutionalized, and subjected to prolonged stays in hospitals and congregate care settings that could have been avoided.

11. Defendants' failure to build an adequate behavioral health system for children and youth violates the EPSDT and "reasonable promptness" provisions of the Medicaid Act, as well as the ADA and Rehabilitation Act. Defendants' ongoing failures harm Rhode Island's children and youth every day. Plaintiffs seek prospective injunctive relief requiring Defendants to provide the medically necessary Intensive Home and Community-Based Services to which Named Plaintiffs and members of the class are entitled under federal law, and to end and prevent their unnecessary institutionalization in hospitals and congregate care settings.

## JURISDCTION AND VENUE

12. This action is brought under 42 U.S.C. § 1983 because Defendants, and each of them, acting under the color of state law, have deprived the Named Plaintiffs and the class members they represent of rights secured by federal law.

13. This Action arises under the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*, Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Accordingly, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). Plaintiffs' claims for declaratory and injunctive relief are

authorized under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are sued in their official capacity and perform their official duties by and through offices within the district and thus reside therein; a substantial part of the events and omissions giving rise to the claims herein occurred within this district; and at least one of the Plaintiffs resides in this district.

## CLASS ALLEGATIONS

15. The Named Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

16. The Class is defined as all current and future Medicaid-eligible children in Rhode Island under the age of 21 (a) who have been diagnosed by a licensed practitioner of the healing arts with SED, including SED with co-occurring DD, and (b) for whom Intensive Home and Community-Based Services have been recommended by a licensed practitioner in order to correct or ameliorate their conditions.

17. The Class is sufficiently numerous to make joinder impracticable. Medicaid covers approximately 180,000 children and youth in Rhode Island, including all 2,500 children involved in the DCYF-administered foster care system. In FY 2024, more than 20,000 Rhode Island children enrolled in Medicaid had a behavioral health disability; 16% of those children have co-occurring developmental disabilities. Further, the fluid nature of the Class, the geographic diversity of Class members, the limited financial resources of Class members, as well as the unknown identity of future Class members, make joinder impracticable.

18. The deficiencies in Rhode Island's behavioral health system for children and youth as detailed more fully below, and the resulting harms to the children in the Class, arise from Defendants' statewide policies and practices, including the following:

a. Defendants' failure to maintain a sufficient array of Intensive Home and Community-Based Services, including Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Services, to meet the needs of children in the Class. For example:

i. EOHHS has admitted that only 57% of children ages 6-17 received critical follow-up care after hospitalization for mental illness.

ii. In 2023, 62.1% of Rhode Island youth who experienced a major depressive episode received no mental health services at all. Worse, only 13.9% received consistent treatment, far below the national average.

iii. While the Medicaid Act requires Defendants to cover medically necessary services for children, regardless of whether they are included in the State Plan or Medicaid Waiver programs, children in Rhode Island only have access to a limited group of services. Treating professionals refer children to the services that exist, even when other services are medically necessary for those children. As a result, Defendants do not provide the medically necessary Intensive Home and Community-Based Services to the children who need them.

iv. Defendants also fail to arrange for or provide services for children at the required intensity, frequency, or duration. As a result, the services Defendants arrange for or provide are not Intensive In-Home Services as required by law.

v. The EOHHS certification standards for one service on which Defendants rely heavily for children with SED and/or co-occurring SED and DD explicitly state the service is "not intended to replace… behavioral health treatment."

vi. Another commonly used service in Rhode Island's behavioral health system is not a mental health service at all; it is designed to provide personal assistance with activities of daily living. Though its goal of improving social skills and maintaining safety may be related to behavioral health needs, EOHHS's certification standards explicitly state the service is "<u>not</u> for individuals exhibiting marked impairments involving: self-control (e.g., aggression or conduct); severe disturbances in thinking, perception, or mood; or learning disabilities." (emphasis in original). This service necessarily excludes children for whom Intensive Home and Community-Based Services are medically necessary.

b. Defendants' failure to implement or ensure adequate policies and practices to reasonably ensure a sufficient array of Intensive Home and Community-Based Services providers, including providers of Intensive Care Coordination, Intensive

In-Home Services, and Mobile Crisis Services, to meet the needs of the children in the Class. For example:

      i.  Emergency department visits for children with behavioral health diagnoses have risen for more than a decade, increasing by more than 60%, reflecting an overwhelmed behavioral health system ill-equipped to meet children's needs.

     ii.  On June 19, 2024, a snapshot of DCYF-contracted provider capacity showed that one provider of mental health services was at full caseload capacity, and two others had exceeded their full capacity (126% and 132%).

c.  Defendants' failure to implement adequate policies and practices to reasonably ensure that children in the Class are able to obtain the Intensive Home and Community-Based Services to which they are entitled, with reasonable promptness, including to ensure that children with co-occurring DD are not excluded from such services. For example:

      i.  EOHHS fails to maintain data regarding the number of children waiting for or delayed in receiving behavioral health services.

     ii.  A March 6, 2023 snapshot of DCYF's data regarding referrals for DCYF-contracted home-based services showed that 284 youth were on waitlists for services. As of that date, children had been waiting 555 days or more for services. One child had been on the waitlist for more than four years (1485 days).

iii.  According to a report issued by the Rhode Island Coalition for Children and Families ("RICCF")—an organization made up of 42 local stakeholders including 39 providers—on October 17, 2024, 733 children were on waitlists for behavioral health services between January and June 2023, with wait times ranging from one week to one year. RICCF noted that even this figure is likely an undercount, as not all programs track waitlists.

iv.  The June 19, 2024 snapshot of DCYF-contracted provider capacity shows that while hundreds of children are on waitlists, some providers are operating well below capacity. Two providers offer a specific type of outpatient service; they were operating at 25% and 41% of capacity. Although three of the contracted providers of mental health services were operating at or above capacity, the ten mental health providers were at a combined capacity of 82%. By July 31, 2024, that had dropped to 77%.

v.  Many DCYF-contracted providers and services specifically exclude youth with co-occurring intellectual and/or developmental disabilities from their services. For example, the only two DCYF-contracted providers of Multi-Systemic Therapy exclude youth with Autism Spectrum Disorder or other DD from their services. The sole Teen Assertive Community Treatment provider similarly excludes this population.

    d.  Defendants' failure to implement adequate policies and practices to reasonably ensure that the children in the Class are able to obtain medically necessary behavioral health services in the least restrictive environment and most integrated setting appropriate to their needs and are not unnecessarily institutionalized or segregated because Intensive Home and Community-Based Services are unavailable. For example:

        i.  EOHHS fails to maintain data regarding the number of children receiving services in a more restrictive setting than is appropriate to their needs.

        ii.  A June 13, 2022 snapshot of DCYF's data regarding referrals to congregate care settings showed that 115 youth were on waitlists for such placements. Thirty-four of those children were in the hospital awaiting a lower level of care; each had been on the waitlist for 335 days or more.

        iii.  Between November 1, 2022 and June 16, 2023, two Rhode Island hospitals discharged 155 children to lower levels of behavioral health care. Of those, 116 were placed in acute residential treatment facilities or other congregate care.

19. As a result of the policies and practices referenced above and set out more fully below, children in the Class are subject to serious harm including the following: (a) they are being denied the Intensive Home and Community-Based Services to which they are entitled under the Medicaid Act; (b) they are unable to obtain behavioral health services in the least restrictive environment and the most integrated setting appropriate to their needs; (c) they are

unnecessarily institutionalized and denied community integration; and (d) they are exposed to imminent future violations of the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act.

20. There are questions of fact and law common to the claims of all Class members, including the following:

a. Whether Defendants fail to provide or ensure that medically necessary Intensive Home and Community-Based Services are available, and whether the resulting inability of Class members to obtain such services, or to obtain such services with reasonable promptness, violates the Medicaid Act.

b. Whether Defendants fail to implement adequate policies and practices to reasonably monitor and ensure that Class members are able to obtain Intensive Home and Community-Based Services, and whether the resulting inability of Class members to obtain those services or to obtain them with reasonable promptness, violates the Medicaid Act.

c. Whether Defendants fail to ensure that sufficient qualified providers of Intensive Home and Community-Based Services are available to meet the needs of the Class, and whether the resulting inability of Class members to obtain those services or to obtain them with reasonable promptness, violates the Medicaid Act.

d. Whether Defendants fail to make available Intensive Home and Community-Based Services to members of the Class in the most integrated setting appropriate to their needs, and whether the resulting segregation or unnecessary institutionalization of members of the Class, or the resulting risk of such

segregation or unnecessary institutionalization, violates the ADA and the Rehabilitation Act.

e.  Whether Defendants fail to implement adequate coordination, policies and practices, and to reasonably monitor and ensure that Class members are able to obtain Intensive Home and Community-Based Services in the most integrated setting appropriate to their needs, and whether these failures violate the ADA and the Rehabilitation Act.

f.  Whether Defendants fail to ensure a sufficient network of Intensive Home and Community-Based Services providers and to implement adequate policies and practices to reasonably ensure a sufficient array of these services, such that members of the Class are able to obtain mental and behavioral health services in the most integrated setting appropriate to their needs and are not segregated or institutionalized, and whether these failures violate the ADA and the Rehabilitation Act.

g.  Whether Defendants' policies, practices, and procedures in the administration of their mental and behavioral health system violate the Named Plaintiffs' and Class members' rights under Title II of the ADA and the Rehabilitation Act.

h.  Whether the Named Plaintiffs and Class members are entitled to declaratory and injunctive relief to vindicate their statutory rights.

21. Named Plaintiffs are each members of the Class. The claims that the Named Plaintiffs raise, and the resulting harms and risks of serious harm, are typical of those of the Class. Class members' claims arise from the same course of events and circumstances, and each Class member would make similar legal arguments to prove Defendants' liability. The remedies

sought by the Named Plaintiffs are the same remedies that would benefit the Class: a declaration that their statutory rights have been violated and an injunction requiring Defendants to take affirmative action to cure the ongoing violations of law and to provide or arrange for sufficient Intensive Home and Community-Based Services to correct or ameliorate the behavioral health conditions of the Named Plaintiffs and members of the Class.

22. The Named Plaintiffs will fairly and adequately represent the interests of the Class. There are no conflicts among the Named Plaintiffs and any members of the Class. The Next Friends are dedicated to representing the Named Plaintiffs' best interests.

23. The undersigned counsel have extensive experience in litigating civil rights and class action lawsuits, including those involving the rights of children, and the rights of individuals with mental and behavioral health diagnoses and developmental disabilities.

24. Because Defendants have acted or refused to act on grounds that are generally applicable to the Class, injunctive and declaratory relief are appropriate respecting the Class as a whole.

## **PARTIES**

### I.   **PLAINTIFFS**

25. The Plaintiffs are Medicaid-eligible children in Rhode Island under the age of 21 who have been diagnosed with a serious emotional disturbance ("SED"), including with co-occurring SED and developmental disability ("DD"). Each child's treating professional(s) recommended Intensive Home and Community-Based Services to treat their conditions. However, due to the well-known and pervasive deficiencies in Rhode Island's mental health system for children and youth, none of the Plaintiffs received those services with reasonable promptness and/or in the intensity, frequency, and duration they need, as required by federal

law. Further, each Plaintiff is either currently, or was previously, unnecessarily segregated from their families and communities in a hospital or congregate care setting in violation of their rights under the ADA and Rehabilitation Act.

26. The U.S. Department of Health and Human Services ("HHS") defines "children with a serious emotional disturbance" as 1) any persons from birth to age 21,[1] 2) who currently or at any time within the last year, 3) have or were diagnosed as having an emotional, behavioral, or mental disorder specified within the Diagnostic and Statistical Manual ("DSM-IV") which substantially interferes with or limits one or more major life activities. 58 Fed. Reg. 29425 (May 20, 1993).[2]

27. HHS defines a developmental disability as 1) a severe and chronic disability attributable to a mental and/or physical impairment, 2) that manifests before age 22 and is likely to continue indefinitely, and 3) results in substantial functional limitations in three or more of the following major life activities: self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and economic self-sufficiency. 45 C.F.R. § 1325.3.[3]

---

[1] The HHS definition of children with SED includes those up to age 18, or older at the option of the state. Rhode Island's Medicaid State Plan extends Medicaid eligibility to youth until age 21.

[2] Rhode Island defines children with SED to only include those whose disability lasts more than a year or has the potential to do so; the child needs "multi-agency intervention;" and the child is either in an out-of-home placement or at risk of same. R.I. Gen. Laws § 42-72-5(b)(24). However, Medicaid's Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") benefit requires the provision of medically necessary services to all Medicaid-eligible children, and the U.S. DHHS has not approved any plan or waiver using the State's definition of SED. Therefore, this Complaint uses the federal definition of children with a SED.

[3] Rhode Island similarly uses a more restrictive definition of a child with a DD. Such children are only those under age 18, or under 21 if they began receiving DCYF services before age 18 and have continuously received them thereafter. R.I. Gen. Laws § 42-72-5(b)(24). For the reasons discussed in fn. 2, this Complaint uses the federal definition of DD.

### A.  Plaintiff J."E."L.

28. Plaintiff J."E."L. identifies as gender fluid and uses "they/them" pronouns. They go by (and are hereinafter referred to as) E.L. They are a 17-year-old Medicaid recipient from Johnston, Rhode Island. They bring this action through their next friend, Patricia Byrnes, who resides in Barrington, Rhode Island. Ms. Byrnes has worked as an attorney for 40 years, with much of her work focusing on special education and child welfare. She is familiar with the harms and substantial risks of serious harm that E.L. has suffered through the lack of appropriate Medicaid-funded services administered by DCYF and EOHHS. Ms. Byrnes is fully committed to representing E.L. as their next friend.

29. E.L. has a sharp wit. They are artistic and especially enjoy sketching their own creations. They like listening to a wide variety of music.

30. E.L. is diagnosed with SED, specifically Major Depressive Disorder and Post-Traumatic Stress Disorder.

31. Qualified professionals have determined that E.L.'s mental health conditions substantially limit their ability to engage in major life activities, including their functioning in family, school, and community activities.

32. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and/or in the intensity, frequency, and duration they need and to which they are legally entitled, has negatively affected E.L.'s mental health. Although E.L.'s father repeatedly sought community-based behavioral health services in order to keep E.L. safely at home, they were repeatedly institutionalized and segregated in hospitals, residential treatment facilities, and partial hospitalization programs.

33. E.L. is DCYF-involved through its Division of Family Services. E.L. does not receive Intensive Care Coordination from or through DCYF.

34. In January 2021, DCYF referred E.L. to the acute residential treatment program at St. Mary's Home for Children ("St. Mary's") due to safety concerns at home. E.L. later moved to the psychiatric residential treatment facility within St. Mary's.

35. In March 2023, E.L.'s treating psychiatrist documented that they no longer required acute residential care and were ready for discharge. However, St. Mary's did not discharge E.L. at that time due to the lack of necessary and available Intensive Home and Community-Based Services in a less restrictive setting.

36. In April 2023, E.L.'s treating psychiatrist documented that E.L. had regressed due to remaining in a psychiatric residential treatment facility (St. Mary's) and recertified their need for acute residential care.

37. In October 2023, E.L.'s treating psychiatrist again documented that E.L. no longer met the criteria for that level of care, and they were ready for discharge. Again, St. Mary's did not discharge E.L. due to the unavailability of Intensive Home and Community-Based Services.

38. In January 2024, E.L. was accepted to a semi-independent living program designed to support their transition to community living and adulthood. However, E.L. was put on a waitlist for the program, and remained at St. Mary's.

39. In February 2024, E.L. was hospitalized due to self-injurious behavior. Their treating professional expressly linked the behavior to remaining at St. Mary's and not being discharged to appropriate community-based treatment.

40. E.L. remained at St. Mary's until June 2024, when DCYF removed all youth due to allegations of systemic abuse and neglect. E.L. was discharged to the semi-independent living program for which they had been wait-listed.

41. While E.L. sees a clinician through the residential program, they do not receive the Intensive Home and Community-Based Services they need. E.L. continues to attend a segregated school that only serves youth with mental and behavioral health needs. They have been readmitted to the hospital once since transitioning to the residential program.

42. Defendants have failed to ensure E.L.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which they are entitled, E.L. has been and will be unnecessarily institutionalized.

43. E.L. desires intensive behavioral health services in their home and other community-based settings.

**B.  Plaintiff A."T."C.**

44. Plaintiff A."T."C. identifies as transgender and uses "he/him" pronouns. He goes by (and is hereinafter referred to as) T.C. He is a 17-year-old Medicaid recipient from Tiverton, Rhode Island. He brings this action through his grandparents and next friends, D.T and P.T.

45. T.C. is a persistent self-advocate who is eager to help other youth have a better experience than his own. He is interested in creating and listening to music.

46. T.C. is diagnosed with SED, specifically Major Depressive Disorder, Post-Traumatic Stress Disorder, Attention-Deficit/Hyperactivity Disorder, and Social Anxiety Disorder. He also has a seizure disorder.

47. Qualified professionals have determined that T.C.'s mental health conditions substantially limit his ability to engage in major life activities, including his functioning in family, school, and community activities.

48. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration he needs and to which he is legally entitled, has negatively affected T.C.'s mental health. Although D.T. and P.T. repeatedly sought these services in order to keep him safely at home, he was repeatedly institutionalized and segregated in hospitals and residential treatment facilities.

49. T.C. is DCYF-involved through its Division of Community Services and Behavioral Health. Upon information and belief, he does not receive Intensive Care Coordination from or through DCYF.

50. In April 2023, DCYF referred T.C. to the psychiatric residential treatment facility at St. Mary's as a step-down placement from hospitalization. T.C. remained at St. Mary's until June 2024, when DCYF removed all youth due to allegations of systemic abuse and neglect.

51. DCYF planned to return T.C. to his grandparents' home upon discharge and assured D.T. and P.T. that home-based services would be in place prior to discharge. However, there was a months-long waitlist for the service his treating professionals recommended.

52. Although home-based services were medically necessary and the appropriate level of care for T.C., DCYF failed to address the waitlist issue or explore other home-based options. Instead, DCYF considered placing T.C. in another congregate care facility. The setting could not meet his needs due to his seizures.

53. As a result, the Family Court required T.C. to remain at the psychiatric residential treatment facility for another two weeks. He was the only youth residing at St. Mary's during that time, and did not receive any clinical services.

54. T.C. finally left St. Mary's in late June 2024 and returned to his grandparents' house without any therapeutic services in place.

55. T.C. now receives home and community-based services, though not with the intensity, frequency, or duration needed. He continues to attend a segregated school that only serves youth with behavioral health needs.

56. He has been seen at a hospital emergency department since being discharged home. T.C. had a crisis and D.T. attempted to access Mobile Crisis Services, as she had been instructed. Twice, she left a message for the service. It took another two hours for someone to return her calls. By that time, T.C. had gone to the hospital.

57. Defendants have failed to ensure T.C.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which he is entitled, T.C. has been and will be unnecessarily institutionalized.

58. T.C. desires intensive behavioral health services in his home and other community-based settings.

### C.  Plaintiff L.A.

59. Plaintiff L.A. is a 14-year-old Medicaid-eligible youth from West Warwick, Rhode Island. She is the sister of J.L.A., J.S.A., and K.A. L.A. brings this action through her mother and next friend, R.X.

60. L.A.'s family describes her as smart, creative, empathetic, and artistic. She likes to help others and enjoys visiting the mall and zoo.

61. L.A. is diagnosed with SED, including Reactive Attachment Disorder, Disruptive Mood Dysregulation Disorder, Attention-Deficit/Hyperactivity Disorder, Post-Traumatic Stress Disorder, Anxiety Disorder, and Premenstrual Dysphoric Disorder.

62. Qualified professionals have determined that L.A.'s mental conditions substantially limit her ability to engage in major life activities, including her functioning in family, school, and community activities.

63. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration she needs and to which she is legally entitled, has negatively affected L.A.'s mental health. Although her mother repeatedly sought community-based behavioral health services in order to keep L.A. safely at home, she was repeatedly institutionalized in hospitals and residential placements.

64. L.A. is not DCYF-involved. She does not receive Intensive Care Coordination from or through DCYF.

65. L.A. was hospitalized eight separate times in 2018 alone; one on occasion, she was readmitted to the hospital within 30 days of being discharged. Between February 2018 and July 2024, L.A. was hospitalized 12 separate times, the longest lasting 201 consecutive days. Overall, she was hospitalized for 542 days. She also spent 322 consecutive days in residential placement. That is 864 days, or 2.4 years, in out-of-home placements.

66. During one hospitalization in 2018, L.A.'s treatment team recommended a type of service so she could be discharged home. However, DCYF failed to refer L.A. for the services and, as a result, L.A. transitioned to a partial hospitalization program – a more restrictive level of treatment than originally recommended.

67. L.A. has received services through a provider agency since 2021. Her most recent progress report indicates L.A. "has not made much progress due [in part to] services provided just once a week," though EOHHS requires each provider of this particular service to certify that it will provide a minimum of 10 hours per week of such services to each child.

68. During a recent hospitalization, L.A.'s treating professional recommended increased services to support her at home. Instead, she was offered center-based Applied Behavioral Analysis, a service that is inappropriate for L.A. as she is not diagnosed with Autism Spectrum Disorder.

69. Prior to her discharge from the most recent hospitalization on July 24, 2024, L.A.'s treating professionals referred her for assistance with daily living activities. As of this filing, L.A. does not receive the services at the necessary level of intensity.

70. Defendants have failed to ensure L.A.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which she is entitled, L.A. has been and will be unnecessarily institutionalized.

71. L.A. desires intensive behavioral health services in her home and other community-based settings.

### D.  Plaintiff E.M.

72. Plaintiff E.M. is a 15-year-old Medicaid recipient from Warwick, Rhode Island. She brings this action through her mother and next friend, C.M.

73. E.M. loves anime. She has a quick sense of humor and wants to be an actress when she grows up.

74. E.M. is diagnosed with Post-Traumatic Stress Disorder, an SED.

75. Qualified professionals have determined that E.M.'s mental condition substantially limits her ability to engage in major life activities, including her functioning in family, school, and community activities.

76. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration she needs and to which she is legally entitled, has negatively affected E.M.'s mental health. Although her mother, C.M., repeatedly sought community-based behavioral health services in order to keep E.M. safely at home, she was repeatedly institutionalized and segregated in hospitals and residential treatment facilities.

77. E.M. is involved with DCYF through its Division of Community Services and Behavioral Health. She does not receive Intensive Care Coordination from or through DCYF.

78. In April 2023, DCYF determined that E.M.'s foster placement was no longer viable due to E.M.'s trauma-related behaviors, which included restlessly wandering the home all night and self-injury. DCYF failed to ensure access to necessary Intensive Home and Community-Based Services for E.M., instead referring her to the psychiatric residential treatment facility at St. Mary's.

79. In March 2024, E.M. was wait-listed for a less restrictive setting, and remained at St. Mary's until May 2024. She was discharged to a congregate care facility.

80. E.M.'s care at the facility is overseen by a clinician; she also has a community mentor.

81. Defendants have failed to ensure E.M.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which she is entitled, E.M. has been and will be unnecessarily institutionalized.

82. E.M. desires intensive behavioral health services in her home and other community-based settings.

### E. Plaintiff D.R.V.

83. Plaintiff D.R.V. is a 17-year-old Medicaid recipient from Woonsocket, Rhode Island. She brings this action through her mother and next friend, A.R.V.

84. D.R.V. is a kind young lady with a beautiful smile. She loves animals and nature and plans to go into the marketing field.

85. D.R.V. is diagnosed with SED, including Post-Traumatic Stress Disorder, Major Depressive Disorder, Social Anxiety Disorder, and Adjustment Disorder with Depressed Mood. She also has medical conditions and seizures.

86. Qualified professionals have determined that D.R.V.'s mental health disabilities and medical conditions substantially limit her ability to engage in major life activities, including her functioning in family, school, and community activities.

87. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration she needs and to which she is legally entitled, has negatively affected D.R.V.'s mental health. Although her mother,

A.R.V., repeatedly sought community-based behavioral health services in order to keep D.R.V. safely at home, she was repeatedly institutionalized and segregated in hospitals and residential treatment facilities.

88. D.R.V. is involved with DCYF through its Division of Family Services. Upon information and belief, she does not receive Intensive Care Coordination from or through DCYF.

89. In July 2023, DCYF referred D.R.V. to an acute residential treatment program at St. Mary's. DCYF reportedly made the referral because D.R.V.'s family was unable to meet her medical and behavioral health needs. D.R.V. later moved to the psychiatric residential treatment unit at St. Mary's.

90. DCYF began referring D.R.V. to placements offering a lower level of care in January 2024. In March 2024, D.R.V.'s treating psychiatrist documented that D.R.V. was still "awaiting placement at [lower level of care]."

91. In May 2024, due to the unavailability of medically necessary services, D.R.V.'s treating psychiatrist documented a new discharge plan, proposing D.R.V. would move in with a family member at an unspecified future date.

92. D.R.V. was discharged from St. Mary's in June 2024, when DCYF removed all of the youth due to allegations of systemic abuse and neglect. DCYF placed her in a non-family foster home. At that time, DCYF did not have any behavioral health services in place for D.R.V.

93. After her transition to the foster home, D.R.V. reported that her DCYF social worker transported her to physical therapy appointments but had been too busy to ensure D.R.V. got to them all.

94. As of this filing, D.R.V. is finally receiving limited therapy services. She also has a community mentor.

95. Defendants have failed to ensure D.R.V.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which she is entitled, D.R.V. has been and will be unnecessarily institutionalized.

96. D.R.V. desires intensive behavioral health services in her home and other community-based settings.

### F. Plaintiff J.C.

97. Plaintiff J.C. is a 6-year-old Medicaid recipient from East Providence, Rhode Island. He brings this action through his mother and next friend, C.C.

98. J.C. is caring, energetic, and helpful. His mother describes him as "brimming with curiosity." He loves being outdoors, exploring new things, and observing insects. He also enjoys riding his bike and playing with friends.

99. J.C. is diagnosed with co-occurring SED and DD: Autism Spectrum Disorder by history, an unspecified mood disorder, Adjustment Disorder, Anxiety Disorder, and Attention-Deficit/Hyperactivity Disorder.

100. Qualified professionals have determined that J.C.'s mental and developmental conditions substantially limit his ability to engage in major life activities, including his functioning in family, school, and community activities.

101. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration he needs and to which he is legally entitled, has negatively affected J.C.'s mental health. Although J.C.'s mother

repeatedly sought community-based behavioral health services in order to keep J.C. safely at home, he has been institutionalized and segregated in a hospital.

102. J.C. was previously involved with DCYF through its Division of Family Services but is no longer DCYF-involved. When C.C. attempted to access services through DCYF, she was told to contact her husband's private insurance company, and did not receive any assistance or assessment from DCYF.

103. On June 28, 2023, J.C. was admitted to a partial hospitalization program. In preparation for discharge, his treating professional referred J.C. for a particular model of services, but the waitlist was approximately eight weeks long.

104. Instead, an agency provided J.C. with a different service after his discharge on September 27, 2023. These services were insufficient. EOHHS requires these services to be provided 10 hours per week at minimum; J.C. only received three hours per week. He also received one hour per week of cognitive behavioral therapy, for a total of four hours of treatment per week, far below the intensity and frequency J.C. needs.

105. J.C.'s treating professionals recommended additional types of services, but it appears J.C. was never referred or evaluated for such services.

106. In March 2024, J.C.'s treating professionals determined his services needed to increase to three times per week. However, J.C. only received two sessions, or six hours, per week. J.C.'s cognitive behavioral therapy increased, though only by one hour per week, due to increased dysregulation.

107. On or about July 22, 2024, J.C. was readmitted to the partial hospitalization program. By mid-October 2024, J.C.'s treatment team discussed discharge to a lower level of care. However, because of changes in housing and the lack of Intensive Home and

Community-Based Services necessary to meet J.C.'s needs, he was admitted for inpatient treatment at the hospital.

108. Defendants have failed to ensure J.C.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which he is entitled, J.C. is and will be unnecessarily institutionalized.

109. J.C., by his next friend, desires intensive behavioral health services in his home and other community-based settings.

**G. Plaintiff J.L.A.**

110. Plaintiff J.L.A. is a 13-year-old Medicaid-eligible youth from West Warwick, Rhode Island. He is a triplet, along with Plaintiffs J.S.A. and K.A. J.L.A. brings this action through his mother and next friend, R.X.

111. J.L.A.'s family describes him as having a very sweet side. He loves basketball and watching football.

112. J.L.A. is diagnosed with co-occurring SED and DD: Fetal Alcohol Spectrum Disorder, Autism Spectrum Disorder, and Cerebral Palsy, Disruptive Mood Dysregulation Disorder, Oppositional Defiant Disorder, Attention-Deficit/Hyperactivity Disorder, and Reactive Attachment Disorder.

113. Qualified professionals have determined that J.L.A.'s mental and developmental conditions substantially limit his ability to engage in major life activities, including his functioning in family, school, and community activities.

114. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration he needs and to which he is

legally entitled, has negatively affected J.L.A.'s mental health. Although his mother, R.X., repeatedly sought community-based behavioral health services in order to keep J.L.A. safely at home, he was repeatedly institutionalized and segregated in hospitals and residential settings.

115. J.L.A. is DCYF-involved through its Division of Family Services. Yet he does not receive Intensive Care Coordination from or through DCYF.

116. In or about 2016 or 2017, J.L.A. received one model of Intensive Home and Community-Based Services from a provider agency. Although these services were clinically recommended and effective for J.L.A., DCYF decided those services were inappropriate because of J.L.A.'s co-occurring developmental disabilities. Over the objection of his treating psychologist, DCYF discontinued the services.

117. Between September 2021 and May 2023, J.L.A. was hospitalized three different times, the longest of which lasted 265 days. Each time, he was readmitted to the hospital within 30 days of being discharged.

118. He also spent 138 days in residential placements. In total, J.L.A. spent 403 of 614 days (1.1 years), or 65% of that period, in out-of-home placements.

119. From May 2023 to June 2023, J.L.A. received only a fraction of the services for which he had been approved.

120. In June 2023, J.L.A. was admitted to the hospital for another six months.

121. As of January 4, 2024, J.L.A. resides in a congregate care facility in New Hampshire. His mother must travel 2.5 hours each way to participate in J.L.A.'s treatment.

122. Defendants have failed to ensure J.L.A.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency,

intensity, or duration needed. Without the services to which he is entitled, J.L.A. is and will be unnecessarily institutionalized.

123. J.L.A. desires intensive behavioral health services in his home and other community-based settings.

### H. Plaintiff J.S.A.

124. Plaintiff J.S.A. is a 13-year-old Medicaid-eligible youth from West Warwick, Rhode Island. He is a triplet, along with Plaintiffs J.L.A. and K.A. J.S.A. brings this action through his mother and next friend, R.X.

125. J.S.A.'s family describes him as caring, helpful, and hard working. He loves electronics and computers. He also likes doing laundry and going to the laundromat.

126. J.S.A. is diagnosed with co-occurring SED and DD, including Autism Spectrum Disorder, Intellectual Disability, Fetal Alcohol Spectrum Disorder, Cerebral Palsy, Disruptive Mood Dysregulation Disorder, Attention-Deficit/Hyperactivity Disorder, Obsessive Compulsive Disorder, and Intermittent Explosive Disorder.

127. Qualified professionals have determined that J.S.A.'s mental and developmental conditions substantially limit his ability to engage in major life activities, including his functioning in family, school, and community activities.

128. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration he needs and to which he is legally entitled, has negatively affected J.S.A.'s mental health. Although his mother, R.X., repeatedly sought community-based behavioral health services in order to keep J.S.A. safely at home, he was institutionalized and segregated in hospitals.

129. J.S.A. is DCYF-involved through its Division of Family Services. Yet he does not receive Intensive Care Coordination from or through DCYF.

130. Between July 2022 and August 2024, J.S.A. was hospitalized six separate times, totaling 462 days, and spent an additional 103 days in residential placements. In other words, in a period of 740 days, J.S.A. spent 565 of them (1.5 years), or 76% of that period, in out-of-home placements.

131. In March 2024, the hospital prepared to discharge J.S.A. to his family's home and referred him to a provider agency for a particular model of services. However, the agency placed J.S.A. on a six- to seven-month waitlist. Rather than being discharged as planned, J.S.A. remained at the hospital for another two months. J.S.A. was finally discharged on May 13.

132. Although J.S.A.'s treatment team determined he needed outpatient therapy, there is no evidence he was ever referred for this service.

133. On June 14, 2024, J.S.A. was readmitted to an inpatient hospital unit.

134. On July 12, 2024, the hospital reported that J.S.A. had been informally accepted to a residential placement but had to wait for a bed to become available. Although the hospital indicated a willingness to discharge J.S.A. immediately if he had in-home services, those services were not yet in place. J.S.A. therefore remained in the hospital.

135. On July 29, 2024, the provider agency discharged J.S.A. from services because he had transitioned to a congregate care setting in New Hampshire. J.S.A. is in the same placement as J.L.A.; his mother must travel 2.5 hours each way to participate in J.S.A.'s treatment.

136. Defendants have failed to ensure J.S.A.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which he is entitled, J.S.A. is and will be unnecessarily institutionalized.

137. J.S.A. desires intensive behavioral health services in his home and other community-based settings.

### I. Plaintiff K.A.

138. Plaintiff K.A. is a 13-year-old Medicaid-eligible youth from West Warwick, Rhode Island. She is a triplet, along with Plaintiffs J.L.A. and J.S.A. K.A. brings this action through her mother and next friend, R.X.

139. K.A.'s family describes her as sweet and helpful. She loves music, and arts and crafts. When at home, she likes helping care for her infant niece and nephew. She carries pictures of them with her at her current residential placement, and constantly asks about them.

140. K.A. is diagnosed with co-occurring SED and DD: Intellectual Disability, Fetal Alcohol Spectrum Disorder, Autism Spectrum Disorder, Cerebral Palsy, Disruptive Mood Dysregulation Disorder and Attention-Deficit/Hyperactivity Disorder.

141. Qualified professionals have determined that K.A.'s mental and developmental conditions substantially limit her ability to engage in major life activities, including her functioning in family, school, and community activities.

142. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration she needs and to which she is legally entitled, has negatively affected K.A.'s mental health. Although her mother, R.X.,

repeatedly sought community-based behavioral health services in order to keep K.A. safely at home, she was institutionalized and segregated in hospitals and residential settings.

143. K.A. recently became DCYF-involved, only after counsel expressly requested DCYF intervene to prevent a hospital from discharging K.A. home without any services. As of the time of filing, it is unknown whether K.A. will receive Intensive Care Coordination from or through DCYF.

144. Between December 2016 and June 2024, K.A. was hospitalized three different times. She also spent another 463 days in residential placements based at that hospital. Twice, the hospital discharged K.A. to her home without <u>any</u> community-based services in place.

145. On June 20, 2024, the hospital discharged J.A. to her home. Her treating professionals referred K.A. for a specific model of services. However, due to the inadequacy of the provider network, K.A. did not receive them before her next hospitalization on June 28, 2024. Further, despite the need for more intensive assistance, EOHHS's Medicaid policy limited the services K.A. received to 25 hours per week.

146. The treating professionals also referred K.A. to a service that assists with activities of daily living. Notably, the service is not appropriate for her. In the referral for this service, the provider agency documented K.A.'s primary concerns as aggression and self-injurious behavior. EOHHS defines this service as being inappropriate for individuals displaying aggression.

147. Due to Defendants' failure to ensure access to Intensive Home and Community-Based Services to support her safely at home, including access to Mobile Crisis Services, K.A was readmitted to the hospital on June 28, 2024.

148. On August 14, 2024, the community provider discharged K.A. from its services, as K.A. had transitioned to a hospital-based residential program. She remains there as of the date of this Complaint.

149. As of November 5, 2024, the hospital-based residential program intended to discharge K.A. home, without any services, for a third time.

150. Defendants have failed to ensure K.A.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which she is entitled, K.A. is and will be unnecessarily institutionalized.

151. K.A. desires intensive behavioral health services in her home and other community-based settings.

### J.  Plaintiff A.C.

152. Plaintiff A.C. is a 14-year-old Medicaid recipient from Johnston, Rhode Island. She brings this action through her parents and next friends, K.C. and R.C.

153. A.C. is a very happy young teenager who generally enjoys school and likes to stick to her schedule. She likes to be outside, swim, go on carnival rides, and listen and dance to music. She gets sad each Sunday night when she knows her visit home is over and she has to return to her residential placement.

154. A.C. is diagnosed with co-occurring SED and DD: Autism Spectrum Disorder, Depression, Anxiety Disorder, and Attention-Deficit/Hyperactivity Disorder.

155. Qualified professionals have determined that A.C.'s mental and developmental conditions substantially limit her ability to engage in major life activities, including her functioning in family, school, and community activities.

156. Defendants' failure to provide Intensive Home and Community-Based Services in a timely manner, and in the intensity, frequency, and duration she needs and to which she is legally entitled, has negatively affected A.C.'s mental health. Although K.C. and R.C. repeatedly sought community-based behavioral health services in order to keep A.C. safely at home, she was repeatedly institutionalized in hospitals. Her last hospitalization lasted more than 400 consecutive days.

157. A.C. is involved with DCYF through its Division of Community Services and Behavioral Health. She does not receive Intensive Care Coordination from or through DCYF.

158. In early 2020, Plaintiff A.C. obtained a communication device to support her limited verbal communication. Because DCYF failed to provide Intensive Care Coordination and did not ensure A.C. had a comprehensive treatment plan across school and the hospital, A.C. is no longer able to use this device.

159. When A.C. was discharged from a hospitalization in or around late 2021 or early 2022, the necessary Intensive Home and Community-Based Services were unavailable to her. Although in-home services were medically necessary and the appropriate level of care for A.C., DCYF failed to address the lack of such services. Instead, DCYF pushed for out-of-state residential placement. In a final effort by her parents to keep her in Rhode Island, A.C. was placed in a hospital-based residential facility which, at the time of her admission, served only males.

160. As of the date of filing, A.C. remains at the residential facility. She receives educational services at a center-based program specifically for children with Autism Spectrum Disorder.

161. Defendants have failed to ensure A.C.'s access to medically necessary Intensive Home and Community-Based Services with reasonable promptness and/or at the frequency, intensity, or duration needed. Without the services to which she is entitled, A.C. is and will be unnecessarily institutionalized.

162. A.C. desires intensive behavioral health services in her home and other community-based settings.

## II.    DEFENDANTS

163. The Rhode Island Executive Office of Health and Human Services ("EOHHS") is the "single state agency" responsible for administering Rhode Island's Medicaid program and for compliance with all federal requirements. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; R.I. Gen. Laws § 42-7.2-2.

164. Defendant Richard Charest, who is being sued in his official capacity, is the Secretary of EOHHS. As Secretary, he is responsible for supervising EOHHS and managing its departments. R.I. Gen. Laws § 42-7.2-4. Defendant Charest is also responsible for overseeing Rhode Island's Medicaid program and "ensuring the laws are faithfully executed." R.I. Gen. Laws § 42-7.2-5.

165. The Department of Children, Youth and Families ("DCYF"), a department within EOHHS, is responsible for the delivery of mental health services to children with serious emotional disturbances, and children with functional developmental disabilities. R.I. Gen. Laws § 42-72-5(a)-(b). DCYF approves and makes referrals for residential treatment and institutionalization.

166. Defendant Ashley Deckert, who is being sued in her official capacity, is the Director of DCYF.

## STATEMENT OF FACTS

I.    **STATUTORY BACKGROUND**

   A.  **THE FEDERAL MEDICAID ACT AND THE EARLY AND PERIODIC SCREENING, DIAGNOSTIC, AND TREATMENT SERVICES ("EPSDT") PROVISIONS**

167. Medicaid is a cooperative federal-state program that provides federal funding to help states deliver medical assistance to low-income individuals and families. *See* 42 U.S.C. § 1396.

168. States that choose to participate in the program must submit a plan for medical assistance that designates a "single State agency" responsible for administering and supervising the plan in compliance with federal requirements. 42 U.S.C. § 1396a(a)(5).

169. Federal law mandates that states provide Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") services for Medicaid-eligible children under the age of 21. 42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(4)(B). The Centers for Medicare and Medicaid Services ("CMS")—the federal agency responsible for the Medicare and Medicaid programs—has emphasized that the "EPSDT benefit is more robust than the Medicaid benefit for adults and is designed to assure that children receive early detection and care, so that health problems are averted or diagnosed and treated as early as possible."

170. Under the EPSDT provisions of the Medicaid Act, states must ensure children have access to all medically necessary services, including Intensive Home and Community-Based Services, that fit within any of the categories of Medicaid-covered services listed in Section 1905(a) of the Medicaid Act. A service is medically necessary if it is needed to correct or ameliorate a child's mental or behavioral health condition. Notably, a treatment or service does not need to "cure" a condition to be covered under EPSDT. Services that

maintain or improve a child's current health condition must also be covered, as they can prevent conditions from worsening and the development of more costly illnesses. Such services must be covered regardless of whether they are included in the State Plan or Medicaid Waiver programs.

171. Federal law further requires states to arrange or provide these services to Medicaid-eligible children and youth "with reasonable promptness." 42 U.S.C. § 1396a(a)(8). States must "make available a variety of individual and group providers qualified and willing to provide" services to children. 42 C.F.R. § 441.61(b). CMS has confirmed that "[a] number of Medicaid and EPSDT provisions are intended to assure that children have access to an adequate number and range of pediatric providers." A lack of providers does not excuse states from complying with the "reasonable promptness" requirement. Waitlists for medically necessary services also violate the Medicaid Act's "reasonable promptness" requirement.

172. States can administer EPSDT services directly, through fee-for-service arrangements, or by overseeing private entities (such as managed care organizations) contracted to administer the benefit. Regardless of the method, states remain ultimately responsible for ensuring Medicaid-eligible children can access the services they need to address their mental and behavioral health conditions.

**B. THE ADA, THE INTEGRATION MANDATE, AND SECTION 504 OF THE REHABILITATION ACT**

173. The Americans with Disabilities Act ("ADA") was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA acknowledges that "society has tended to isolate and segregate individuals with disabilities," and that "discrimination

against individuals with disabilities continue[s] to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

174. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

175. The Plaintiffs and similarly situated youth they represent are "qualified individuals with disabilities" as defined by the ADA and its regulations. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104. A disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108.

176. Defendants are public entities, and administer Rhode Island's Medicaid program through public entities, subject to the ADA's nondiscrimination requirements.

177. Public entities must "provide services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting" is defined as one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B. Additionally, the ADA's implementing regulations prohibit public entities from using "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3).

178. Public entities must also "make reasonable modifications in [their] policies, practices, and procedures" to avoid discrimination, unless the public entity can demonstrate that the modification would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

179. In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court held that Title II of the ADA prohibits the unjustified segregation of people with disabilities, ruling that unnecessary institutionalization constitutes discrimination under the ADA. *Id.* at 600, 607. The Court explained that unnecessary institutionalization not only "perpetuates unwarranted assumptions" about individuals with disabilities, suggesting they are "incapable or unworthy of participating in community life," but also "severely diminishes the everyday life activities of individuals, including family relations, social contacts…[and] educational advancement." *Id.* at 600-1.

180. *Olmstead* requires states to "provide community-based treatment for persons with mental disabilities when 1) []treatment professionals determine that such placement is appropriate, 2) the affected persons do not oppose such treatment, and 3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607.

181. In 2011, the U.S. Department of Justice ("DOJ") issued a statement on enforcement of the integration mandate articulated in *Olmstead*. The DOJ clarified that "[i]ntegrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities." They

are "located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible." The DOJ emphasized that the integration mandate applies in cases where "a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities." The DOJ further noted that, pursuant to *Olmstead*, "[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent."

182. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, imposes similar requirements on programs and activities that receive federal financial assistance. *See*, *e.g.*, 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(2).

### C. RHODE ISLAND'S MEDICAID PROGRAM

183. Rhode Island has opted into the Medicaid program and, as a result, must comply with Medicaid law and regulations to continue receiving federal funds.

184. EOHHS is the "single State agency" responsible for administering Rhode Island Medicaid in compliance with federal law. R.I. Gen. Laws § 42-7.2-2. Rhode Island has developed a State Plan, reviewed and approved by the U.S. Department of Health and Human Services, that, along with federal law and regulations, forms the foundation of Rhode Island's Medicaid program.

185. Rhode Island acknowledges that its Medicaid program must cover certain mandatory benefits required by federal law, including children's services under EPSDT. Rhode Island extends EPSDT coverage to children up to age 19, Supplemental Security Income-eligible children up to age 21, and youth aging out of foster care up to age 21. 210 R.I.

Code R. § 30-05-2.8(A)(4). Youth transitioning to adult services are also eligible for EPSDT until age 21. *Id.*

186. Rhode Island law guarantees Medicaid-eligible children and youth the right to receive "the full scope of services covered under the Medicaid State Plan and the State's Section 1115 waiver" as well as coverage for "all follow-up diagnostic and treatment services deemed medically necessary to ameliorate or correct defects and…mental illness and conditions discovered through screening or at any other occasion, whether or not those services are covered by the State Medicaid Plan or the State's Medicaid Section 1115 waiver." *Id.* A "medically necessary service" is defined as a service "required for the prevention, diagnosis, cure, or treatment of a health-related condition including any such services that are necessary to prevent a detrimental change in…mental health status." 210 R.I. Code R. § 30-05-2.8(A)(3). Medically necessary services "must be provided in the most cost-efficient and appropriate setting and must not be provided solely for the convenience of the… service provider." *Id.*

187. Rhode Island does not administer children's mental health services through a different agency from children's developmental disability services. Nor does it fund services separately depending on the child's diagnosis. Services for children with co-occurring SED and DD are the same as those for children diagnosed only with SED, though children with co-occurring disabilities may require modifications and accommodations related to their DD.

188. DCYF, an agency within EOHHS, is responsible for administering a statewide network of supports to protect vulnerable children and families. It has statutory authority over

children's behavioral health services for all children in Rhode Island. R.I. Gen. Laws § 42-72-5(a)-(b).

189. DCYF is tasked with "develop[ing] a design of a continuum of care for children's behavioral health services that encourages the use of alternative psychiatric and other services to hospitalization and review[ing] the utilization of each service in order to better match services and programs to the needs of the children and families as well as continuously improve the quality of and access to services." R.I. Gen. Laws § 42-72-5.2.

190. Children and youth in Rhode Island access behavioral health services, including mental health and developmental disability services, through DCYF. Youth receiving child welfare services from DCYF are served through its Division of Family Services.

191. Youth who are not in the care or custody of DCYF access services through its Division of Community Services and Behavioral Health. Youth must first access services when they are less than 18-years-old and may receive services through the age of 21. Parents are not required to relinquish custody or control of their children in order to access services through this Division.

192. According to written DCYF policy, youth who access services through the Division of Community Services and Behavioral Health are to be assigned a Family Navigator, who is responsible for assessing Medicaid eligibility and assisting the family in applying for Medicaid as needed. The Family Navigator is also responsible for conducting a Level of Need Assessment to identify appropriate services, which are funded through private health insurance, Medicaid, and/or DCYF funds. Once appropriate services are identified, the Family Navigator is tasked with referring the child to those services.

193. In practice, Plaintiff parents report a different experience. For example, when Plaintiff J.C.'s mother, C.C., attempted to access services through DCYF, she was told to contact her husband's private insurance company, and did not receive any assistance or assessment from DCYF.

194. Recently, Rhode Island transitioned several of its Community Mental Health Centers ("CMHC") into Certified Community Behavioral Health Centers ("CCBHC"). Under the prior CMHC system, the state contracted with six providers to deliver behavioral health services statewide. However, the CMHC model was consistently plagued by provider shortages and long waitlists, leaving Plaintiffs without timely access to medically necessary behavioral health services.

195. Defendants have long been aware that the state's Medicaid program, including the CMHC service delivery model, lacked network adequacy. Audits of Rhode Island's Medicaid Managed Care plans consistently revealed a severe lack of access to children and adolescent behavioral health services. In 2022, one managed care organization ("MCO") audit showed that only six out of 30 providers (20%) had routine appointments available for children's behavioral health, and only 10% of appointments were timely. Another MCO audit found that only three out of ten providers (30%) had available routine appointments for children's behavioral health, none of which were timely.

196. Rhode Island anticipates the transition to the CCBHC model will resolve these issues. CCBHCs are required to serve all individuals seeking behavioral health care—including children and youth—without waitlists. However, there is inadequate evidence that Defendants have taken sufficient steps, including building the needed service provider capacity, to ensure that CCBHCs will actually deliver on those promised outcomes.

197. Defendants themselves have acknowledged that "not all prospective CCBHCs will begin operations in FY 2025, nor will those that are starting [] be fully staffed in FY 2025."

198. Defendants have further acknowledged that the transition to the CCBHC system may not lead to improved access to behavioral health care. EOHHS has admitted that "CCBHC costs and visits are highly uncertain in the first year of the program," and that "it is unknown the extent to which providers will be able to hire more staff and to what extent behavioral health service utilization will increase with the new program."

## II. PLAINTIFFS NEED INTENSIVE COMMUNITY-BASED BEHAVIORAL HEALTH SERVICES TO ADDRESS THEIR BEHAVIORAL HEALTH NEEDS WITHOUT RESORTING TO HOSPITALIZATION OR OTHER INSTITUTIONALIZATION.

199. The Center for Medicaid and CHIP Services ("CMCS") has cautioned that "[w]ithout treatment, children with behavioral health conditions face a range of problems in adulthood, including increased risk of criminal justice involvement and instability in employment and relationships."

200. CMCS has further emphasized that states have "broad flexibility" to design comprehensive care plans that cover a continuum of services, including "intensive community-based services, crisis stabilization, and intensive care coordination." According to CMCS, states are required to "ensure coverage and reimbursement are available for services at an intermediate level of care, such as intensive in-home services, partial hospitalization services, and wrap around services, to correct or ameliorate identified behavioral health conditions."

201. The Intensive Home and Community-Based Services at issue in this case are not only medically necessary; they are life-changing. Intensive Home and Community-Based Services allow children and youth to receive essential treatment for their disabilities while

remaining in their homes and communities, enabling them to participate in important aspects of childhood such as attending school, playing sports, exploring hobbies, and maintaining social relationships.

202. For children with co-occurring SED and DD, Defendants' failure to provide or arrange for medically necessary Intensive Home and Community-Based Services is even more dire. Unmet behavioral health needs in children with DD impact the ability to successfully transition to school and the transition from school to adulthood. For children with DD and behavioral health needs, gaps in a full continuum of appropriate and coordinated behavioral health services can create health and safety issues, including trauma, criminalization of their behavior, inappropriate use of medication to control behavior, and difficulties in developing coping skills.

203. Children with co-occurring SED and DD require integrated multidisciplinary supports. They may require adaptations to behavioral health services due to the symptoms of their disabilities, such as expressive and receptive language skills. Sessions may need to be shorter and more frequent, and therapy may require more structure. Training for clinicians is critical; staff in the mental health system often feel unprepared to care for individuals with co-occurring DD.

204. Publicly available information clearly shows that Defendants do not ensure Plaintiffs have access to Intensive Care Coordination services, Intensive In-Home Behavioral Services, or Mobile Crisis Services in a timely manner and/or with the intensity, frequency, and duration that is medically necessary.

### A. DEFENDANTS KNOW AND ADMIT THEY DO NOT ENSURE PLAINTIFFS' ACCESS TO INTENSIVE HOME AND COMMUNITY-BASED SERVICES.

205. Since at least 2015, EOHHS has acknowledged a persistent "scarcity of mental health professionals" that results in waiting lists, which "are one outward sign of a lack of sufficient access to care and resources." EOHHS knows that capacity is "a key factor in low outreach, access, and quality satisfaction ratings." EOHHS has further admitted that "the workforce crisis impacts every aspect of support and care, which then decreases capacity and increases access and quality concerns… An overall pervasive workforce deficit is a fault line impacting… the full continuum of support and services."

206. Recognizing that it needed "to assess gaps in the [behavioral health] system, identify policy and implementation priorities, and establish implementation plans for those priorities," EOHHS hired the Faulkner Consulting Group ("Faulkner Group) in 2021. The Faulkner Group confirmed that "[a]ccess to children's [behavioral health] services is [a] significant challenge for RI families, and for RI providers trying to match treatment level need with available capacity." The Faulkner Group identified "significant shortages" in home based therapeutic services, as well as "moderate shortages" in enhanced outpatient services, home and community-based services, and mobile crisis services. The Faulkner Group also warned that "[t]he gap in inpatient/acute services appears to be driven by the lack of crisis intervention and community wrap around support and prevention."

207. The Faulkner Group highlighted the inadequate provider network as a critical issue, finding that Rhode Island's workforce recruitment and retention challenges were driven in part by low wages and insufficient reimbursement. It warned: "There are high turnover rates among [behavioral health] providers, and providers may opt to go into private

practice[,] accept cash-only payments or move to bordering states with higher reimbursement options. Workforce shortages have led to a lack of capacity to meet [behavioral health] need." The Group also specifically noted the lack of "qualified specialty providers,[] particularly for community-based services for children."

208.  The Faulkner Group did not just identify problems; it proposed solutions: "Our recommendation is *not* to build additional inpatient capacity, rather to invest resources in better community support to alleviate the bottleneck for the existing inpatient beds." It observed treatment capacity challenges "could be driven by insufficient access to prevention."

209.  In 2022, EOHHS openly admitted that the state's behavioral health crisis was "still not being adequately addressed." It acknowledged that Rhode Island "ranks 33rd in overall child behavioral health outcomes" and "[i]n the majority of behavioral health metrics, Rhode Island ranks worse than the US average." It also acknowledged that "[t]he inadequacy of the Rhode Island behavioral health system" is due in part to being "underfunded for years, [leading] to workforce shortages, siloed state agency approaches and policies, and waiting lists that leave families at risk."

210.  EOHHS pledged to improve, declaring that Rhode Island "must commit to raising [itself] to the top of the United States with the metrics where we are low." In 2023, it outlined broad goals, including developing a strong continuum of care, ensuring that procured services meet identified needs, addressing service gaps, and increasing accountability in service provision. EOHHS admitted, "We do have the tools to accomplish this."

211.  Yet the same inadequacies in the system persist today. In May 2024, the DOJ confirmed, "Current DCYF-contracted providers offering long-term, intensive, high-acuity,

community-based care do not serve a sufficient number of children to avoid the unnecessary hospitalization of children."

212. On October 17, 2024, a report released by the Rhode Island Coalition for Children and Families ("RICCF") made clear that children's access to intensive behavioral services remains "highly limited."

213. Defendants recognize the need to ensure children with SED and co-occurring DD have access to appropriate services. In 2020, EOHHS requested that the Center for START Services at the University of New Hampshire ("the Center") conduct a study of Rhode Island's services for individuals with co-occurring mental health and developmental disabilities. The Center identified the need to expand capacity for services, as treatment professionals who are qualified to treat individuals with developmental disabilities "are not always accessible and the services available do not always appropriately meet identified needs." Further, improved coordination and information sharing is required. Finally, the Center found a lack of crisis response services for people with developmental disabilities, particularly due to the lack of training to respond to individuals with developmental disabilities who are experiencing a mental health crisis.

214. The Center recommended that EOHHS implement a START pilot to serve approximately 450-600 youth over a four-year period. Although EOHHS publicly announced financial support for the pilot, it was later removed from the budget.

215. Nor has EOHHS otherwise ensured that specialized community-based behavioral health services are available for youth with SED and co-occurring DD, a fact confirmed by the DOJ.

216. As a result, Plaintiffs and similarly situated youth, who have SED, including co-occurring SED and DD, are denied medically necessary behavioral health services to which they are entitled.

**B. PLAINTIFFS LACK ACCESS TO INTENSIVE CARE COORDINATION.**

217. Intensive Care Coordination is an Intensive Home and Community-Based Service designed for children and youth with complex behavioral health needs who, like Plaintiffs, require services and supports from multiple providers, systems, and agencies. Intensive Care Coordination goes beyond traditional case management by offering families a coordinated approach to accessing these essential services. Both CMCS and the Substance Abuse and Mental Health Services Administration ("SAMHSA") have recognized that Intensive Care Coordination includes "assessment and service planning, accessing and arranging for services, coordinating multiple services, including access to services…and monitoring progress." It has been proven to significantly improve outcomes for children and youth. It is covered under Medicaid as a case management and/or rehabilitative service. 42 U.S.C. §§ 1396d(a)(13), (a)(19); 42 U.S.C. § 1396n(g)(2); 42 C.F.R. §§ 440.130(d), 440.169, 441.18.

218. EOHHS knows that Intensive Care Coordination is necessary for Plaintiffs and similarly situated youth, acknowledging that children with "serious emotional and/or behavioral disturbances and multiple system involvement…will require intensive coordination of services and supports." But the Faulkner Group revealed that in Rhode Island, "[c]are coordination is often overlapping and duplicated, which can be both ineffective and confusing for clients."

219. EOHHS acknowledges that "[t]raditional case management, [Managed Care Organization] care coordination, or health home approaches are often not sufficient for children and youth with significant behavioral health challenges." And yet, 38% of respondents to a 2024 EOHHS assessment reported access concerns with targeted case management, and 33% highlighted access concerns with wraparound services (of which Intensive Care Coordination is a component) for children and families. EOHHS identified "a phenomenon referred to as 'case management fatigue,' in which individuals in the field are constantly facing waiting lists and being unable to connect the people they are working with to needed support and services due to a range of dead ends."

220. Plaintiffs' experiences are illustrative.

   a. The only case management service A.C. received is the very Managed Care Organization care coordination that EOHHS admits is inadequate.

   b. Neither Plaintiffs L.A. nor J.C. receive Intensive Care Coordination services from DCYF, as they are not DCYF-involved.

   c. J.L.A. and J.S.A., who are DCYF-involved, also do not receive care coordination services. Instead, their mother and next friend, R.X., researches and seeks out services for her children, then communicates the desire for those services to DCYF, so DCYF can evaluate whether and how to pay for the services.

   d. E.L., E.M., and T.C. are involved with DCYF but do not receive Intensive Care Coordination services. D.R.V. is also involved with DCYF; upon information and belief, DCYF does not provide her with care coordination services.

### C. PLAINTIFFS LACK ACCESS TO INTENSIVE IN-HOME BEHAVIORAL SERVICES.

221. Intensive In-Home Behavioral Services are designed to provide therapeutic interventions directly to children and families in their homes and community settings, with the goal of improving the child's functioning and preventing out-of-home placements in hospitals or congregate care settings. Both CMCS and SAMHSA emphasize that Intensive In-Home Behavioral Services should include individual and family therapy, behavioral interventions, and skills training, with staff maintaining small caseloads to allow for intensive, personalized care.

222. Intensive In-Home Behavioral Services have been proven to significantly improve outcomes for children and youth. Intensive In-Home Behavioral Services are covered under Medicaid as rehabilitative services.

223. EOHHS acknowledges that "[a] comprehensive system of care will have available a wide array of community services" including "intensive in-home services." However, it has admitted that "[a]t higher levels of acuity, there are limited intensive in-home behavioral health treatment options, which constrains the possibility of offering behavioral health services in the least-restrictive setting appropriate." It further conceded that the "major gap" in Intensive In-Home Behavioral Services is "believed to be driving children and youth to inpatient care in greater numbers than before and/or lengthening in-patient stays."

224. EOHHS has also acknowledged the need to "expand Intensive Home and Community Based Services to remove waitlists." It has indicated "[t]he initial focus should be on increasing the state-wide capacity of…intensive in-home behavioral health services" by

"utiliz[ing] mental health and educational stimulus dollars to expand, enhance, and increase school and community-based children's behavioral health services."

225. In May 2024, the DOJ concluded its investigation into Rhode Island's behavioral health system for children and youth. The DOJ subsequently issued a Letter of Findings, which revealed that "there are fewer providers who possess the specialized training necessary to provide the intense behavioral health supports needed by the focus population." The DOJ found that "[f]or various community-based programs, the State has failed to ensure adequate reimbursement rates for providers of home and community-based behavioral health services." Inadequate reimbursement rates have "led to providers being unable to meet demand for community-based services, resulting in gaps in the service array and extended waits for behavioral health services." The DOJ concluded that "DCYF has not leveraged federal funds or resources across state agencies to invest in building the capacity of providers to support youth with intense behavioral support needs."

226. Plaintiffs are unable to obtain medically necessary Intensive In-Home Behavioral Services because the services do not exist, are not provided with reasonable promptness, and/or are not provided at the intensity, frequency, and/or duration that is medically necessary. Plaintiffs' experiences demonstrate this:

    a. Plaintiff T.C. was on a waitlist for medically necessary Intensive In-Home Behavioral Services. Due to Defendants' failure to ensure access to the services he needed with reasonable promptness, T.C. remained in a psychiatric residential treatment facility despite being ready for discharge. He received no clinical or behavioral health services during that period.

b. E.L.'s treating physician determined in March 2023 that Intensive In-Home Behavioral Services were medically necessary for them. They languished at St. Mary's for 15 months, spending more than 150 of those days on a waitlist for placement, due to Defendants' failure to ensure E.L.'s access to medically necessary services.

c. D.R.V. likewise languished at St. Mary's for six months while waiting for medically necessary Intensive In-Home Behavioral Services. She was ultimately discharged without any behavioral health services, intensive or otherwise.

d. Plaintiffs are unable to access Intensive In-Home Behavioral Services with reasonable promptness and/or in the intensity, frequency, and duration they require. Neither Plaintiffs J.C. nor L.A. received even the minimum amount of services that EOHHS mandates, much less the amount necessary to ameliorate their conditions. Nor, upon information and belief, did J.C.'s provider implement accommodations consistently to ensure equal access to the services due to his co-occurring DD.

e. In early 2020, Plaintiff A.C. obtained a communication device to support her limited verbal communication. Upon information and belief, Defendant DCYF failed to coordinate with A.C.'s school and hospital regarding the device, and A.C. is no longer able to use it.

f. K.A. was twice discharged home from the hospital without any services, intensive or otherwise, despite clear medical necessity for Intensive In-Home Behavioral Services. When she was discharged with a type of service in June 2024, Defendants failed to ensure access to that service at the intensity that was

medically necessary, due solely to her needs exceeding the EOHHS-mandated maximum hours for those services. As of November 5, 2024, the hospital again discussed discharging K.A. without services in place; the service for which she was referred has a six-month waitlist.

g.  J.S.A. was placed on a waitlist for services, languishing in the hospital for two months until the services became available to him. Defendants failed to ensure he was able to access all medically necessary services in a timely manner; 31 days later, J.S.A. was re-hospitalized.

h.  DCYF reportedly discontinued J.L.A.'s services despite the explicit disagreement of his treating physician, simply because he has co-occurring DD.

### D.  PLAINTIFFS LACK ACCESS TO MOBILE CRISIS SERVICES.

227.  Mobile Crisis Services, also an Intensive Home and Community-Based Service, provide immediate intervention during mental and behavioral health crises experienced at home and in the community. They are covered under Medicaid as rehabilitative services.

228.  Both CMCS and SAMHSA have emphasized that Mobile Crisis Services are "instrumental in defusing and de-escalating difficult mental health situations and preventing unnecessary out-of-home placements, particularly hospitalizations." Mobile Crisis Services have been proven to significantly improve outcomes for children and youth.

229.  EOHHS acknowledges the importance of Mobile Crisis Services, noting their critical role in "interced[ing] upstream, before urgent behavioral situations become unmanageable emergencies." It recognizes that Mobile Crisis Services "can be instrumental in averting

unnecessary emergency department (ED) visits, psychiatric hospitalizations, out-of-home placements, and placement disruptions, and in reducing overall system costs."

230. Defendants further acknowledge implementing a mobile crisis response team "would likely result in savings as individuals are diverted away from the emergency room." But while Defendants know that states with Mobile Crisis Services "have consistently demonstrated cost savings while simultaneously improving outcomes and achieving higher family satisfaction," they concede that Rhode Island still "currently lacks a comprehensive statewide mobile crisis services system, leaving the State ill-equipped to handle crisis events that occur outside of facility settings."

231. EOHHS attempted to address this gap by piloting Children's Mobile Crisis and Response Stabilization services in August 2020. Between August 2020 and April 2022, 202 youth received such services. Of those who completed their mobile crisis care plans, 74% were able to avoid hospitalization and were placed on an aftercare plan. However, the program was still unable to serve all referred youth "due to ongoing workforce challenges." And despite the success of the pilot program, Defendants failed to ensure continued access to Mobile Crisis Services for nearly one year.

232. In November 2022, EOHHS restarted the State's Mobile Response and Stabilization Service by contracting with two providers. These providers offered "short-term stabilization and case management for up to 30 days."

233. By November 2023, 464 children and youth experiencing crises had been served by Mobile Crisis Services. According to DCYF, 92% were stabilized in the community without psychiatric hospitalization, "providing strong evidence of the efficacy and need for this service." By March 2024, the number of people served was over 500.

234. Despite these improvements, EOHHS also found that 43% of respondents to its 2024 Community Needs Assessment still reported access concerns with crisis 24-hour mobile stabilization services. The DOJ's Letter of Findings further confirmed that Rhode Island's mobile crisis program is "only starting to fill what has been previously described as an utter void in crisis services for children with behavioral-health disabilities."

235. According to the October 17, 2024 RICCF report written by local stakeholders and providers, Mobile Crisis Services continue to "lack[] permanent funding, as initial grant dollars are running out." RICCF concluded that "the future of the MRSS [Mobile Response and Stabilization Service] model and its stabilization focus remains uncertain."

236. Due to insufficient access to Mobile Crisis Services, some youth are unnecessarily sent to the hospital. For example, when Plaintiff K.A. was in crisis in June, she was not referred to Mobile Crisis. Instead, she was directed to the hospital, and subsequently admitted to inpatient treatment.

237. Even where Mobile Crisis Services exist, they are far from robust and responsive. Plaintiff T.C. had a crisis, and his grandmother, D.T., called Mobile Crisis as T.C.'s provider agency had instructed. No one answered the first time, so she left a message. No one answered the second time, so she left another message. D.T. reported that it took another two hours for someone to return her calls. By that time, T.C. had gone to the hospital.

### III. DEFENDANTS' FAILURE TO PROVIDE PLAINTIFFS WITH INTENSIVE COMMUNITY-BASED BEHAVIORAL HEALTH SERVICES RESULTS IN UNNECESSARY INSTITUTIONALIZATION.

238. Defendants' ongoing failure to ensure Plaintiffs have timely, statewide access to Intensive Home and Community-Based Services also violates Plaintiffs' rights under the ADA.

239.  The ADA "prohibits discrimination on the basis of disability in public programs, including Medicaid." This means services must be provided in the community, rather than in institutional settings, "when the need for community services can be reasonably accommodated and providing services in the community will not fundamentally alter the state's Medicaid program."

240.  Rhode Island law requires Defendants to develop a continuum of care that "encourages the use of alternative psychiatric and other services to hospitalization" and which includes "community-based prevention, family support, and crisis-intervention services." R.I. Gen. Laws § 42-72-5.2; § 42-72-5(b)(27). DCYF recognizes its responsibility for "developing a continuum of care for children's behavioral health services to support children within their family settings" and "in the least restrictive environment possible."

241.  Yet Rhode Island relies on a variety of restrictive settings to treat children and youth with mental and behavioral health disabilities who could, with access to the Intensive Home and Community-Based Services at issue in this lawsuit, receive treatment while remaining in their homes and communities. Those restrictive settings include emergency rooms, hospital inpatient programs, psychiatric residential treatment facilities, and congregate care facilities.

242.  EOHHS is aware that the "lack of capacity for outpatient care and services in the community [] can lead to unnecessary utilization of more restrictive and more expensive levels of care…and longer length of stay for inpatient care." However, the Faulkner Group observed that Defendants have "steadily shifted away from community-based services toward inpatient services." According to the Group, the use of children's residential

psychiatric services has "seen a significant increase," doubling from 2017 to 2019, while the use of outpatient services has been decreasing.

243. DCYF has admitted that "children's behavioral health services [are]…too often carried out in more restrictive settings than necessary." Defendant Deckert publicly acknowledged that "sometimes kids linger in these [residential] settings longer than they should." As far back as 2010, Rhode Island's institutionalization rate had been considered among the "worst in the nation and vastly above the national average." As of 2022, Rhode Island's rate of institutionalization is still 50% above the national average.

244. Even DCYF's own data shows that a significant portion of children placed in congregate settings could be served in community-based homes. DCYF uses a Level of Need ("LON") assessment to "clearly identify what each child's needs are, what type of homes would be a best fit for their needs, and what services might be needed." According to DCYF, "[m]ost children and youth who are placed with foster families score at a 1, 2, or 3." And yet, nearly half of Rhode Island children and youth in restrictive treatment facilities have a LON Tier Score of 3 or lower.

245. In May 2024, the DOJ concluded that Rhode Island violated Title II of the ADA and Section 504 of the Rehabilitation Act by "failing to provide services to children with behavioral health disabilities in the most integrated setting appropriate to their needs," resulting in children being "routinely and unnecessarily segregated in an acute-care psychiatric hospital." Between 2017 and 2022, 527 children either in DCYF care or voluntarily receiving services through DCYF were admitted to Bradley Hospital, a psychiatric hospital that exclusively treats children and youth. Many of these children were forced to remain hospitalized for far longer than medically necessary, with approximately

116 children (22%) staying for more than 100 consecutive days. Nearly 40% were re-hospitalized multiple times. Most were re-hospitalized with 30 days of discharge. Critically, the DOJ concluded that these extended hospital stays were the result of "DCYF's failure to secure appropriate services to allow a child to safely live with his or her family or in another community setting." The DOJ investigation revealed that children with behavioral health disabilities could be treated in less restrictive settings than hospitals, but many remained hospitalized "simply because DCYF has failed to ensure sufficient capacity of community-based services and prompt and effective discharge planning." The DOJ further noted that "[t]he demand for community-based services…greatly exceeds the current supply," and "many children require hospitalization because of the insufficient supply of community-based services in the State."

246. As of August 2024, around 80 Rhode Island children were placed in out-of-state residential psychiatric facilities—with some as far away as Idaho. Several of these facilities have been linked to abuse, understaffing, and even deaths. But the Office of the Child Advocate—the designated advocacy office for children in DCYF care—only visits those out-of-state facilities approximately once a year. The number of children placed in out-of-state facilities has grown by 30% between 2022 and 2024. The amount DCYF spends on out-of-state facilities has ballooned in that same period by over 2000%, from $71,380 to $1.98 million.

247. Plaintiffs are but a few examples of the routine and unnecessary segregation of youth with behavioral health needs in Rhode Island.

    a. All ten Plaintiffs have experienced at least one in-patient hospitalization; most have been hospitalized repeatedly.

    b. At just six years old, J.C. is currently hospitalized in an in-patient psychiatric unit.

c.  L.A. was hospitalized at least 12 times, with her longest admission lasting 201 consecutive days. She was also institutionalized in multiple residential placements, one lasting for 322 consecutive days.

d.  J.L.A. was hospitalized at least three times, with his longest lasting 265 days. He is currently institutionalized.

e.  A.C. was repeatedly hospitalized, with her longest admission lasting 400 consecutive days. She is currently institutionalized.

f.  J.S.A. was hospitalized six times in two years, for a total of 462 days. He was also institutionalized in multiple residential placements and remains so currently.

g.  J.L.A., J.S.A. and L.A. have experienced readmission to the hospital within one month of the previous discharge.

h.  DCYF referred E.L., T.C., E.M., and D.R.V. to St. Mary's, presumably because each required a higher level of care. However, St. Mary's provided only a minimal amount of behavioral health services each week. Notably, E.M. did not receive services designed to address her sole diagnosis (Post-Traumatic Stress Disorder). These children could have received more frequent and intensive services in the community than they did at St. Mary's.

## IV.  ENSURING ACCESS TO INTENSIVE COMMUNITY-BASED BEHAVIORAL HEALTH TREATMENT IS NOT A FUNDAMENTAL ALTERATION TO RHODE ISLAND'S MEDICAID PROGRAM.

248.  The DOJ recommended that Rhode Island ensure these critical services are "accessible and available in sufficient quantity and intensity to prevent unnecessarily lengthy and repeated hospitalizations at Bradley." It also called for improved discharge planning "to facilitate prompt discharge to the most integrated setting appropriate."

249. The DOJ further found that ensuring access to Intensive Home and Community-Based Services would not "fundamentally alter" Rhode Island's Medicaid program, as the need for community-based services can be reasonably accommodated. It emphasized that states "may be required to provide reasonable modifications—such as expanding community-based services—even if that requires the state to increase the financial resources it devotes to these services."

250. The DOJ pointed out that expanding these existing services "is a reasonable modification," especially since it aligns with Rhode Island's "plans and obligations." Defendants recognize the "limited existing capacity" for community-based behavioral health services and "expressed an intention to expand existing programs." EOHHS agreed that while its system of care would "have an array of residential services," the use of those services "should decrease over time as data shows that systems of care result in savings by reducing inappropriate use of inpatient services, residential treatment, and out-of-home placements across child-serving systems, even as they increase the use of home and community-based services, supports, and intensive care management." EOHHS indicated that its "primary [] strategy" for its children's behavioral health system of care was "focus on prevention, mobile crisis, and care coordination" rather than "spending money on more expensive hospitalizations, Emergency Department (ED) visits, and other more restrictive care."

251. Further, shifting Defendants' financial resources would not fundamentally alter Rhode Island's Medicaid program. As the DOJ pointed out, "shifting spending toward community-based services is both reasonable and more cost-effective," as reducing reliance on expensive, restrictive settings could "save the State millions of dollars every year, which

could be reinvested back into building out increased community-based options and services" for children and youth.

252. Defendants know that Intensive Home and Community-Based Services cost a fraction of what it costs to serve children in congregate care settings. For example, in FY 2021 alone, Rhode Island spent over $13.6 million in Medicaid dollars on psychiatric hospitalizations and nearly $27 million on residential treatment facilities for children in DCYF care. In contrast, according to both the Centers for Medicare and Medicaid Services and the Substance Abuse and Mental Health Services Administration, states that invested in community-based services rather than psychiatric residential treatment facilities realized "an average savings of $40,000 per year per child." Yet instead of investing in Intensive Home and Community-Based Services that would help prevent institutional placements, Defendants allocated $45 million to construct a new 16-bed residential treatment facility for girls.

253. Although Defendants acknowledge that "[t]he first step of complying with *Olmstead* is developing a plan that works for moving people out of restrictive settings into the community," stating that "we strive to design a plan that also prevents unnecessary institutionalization in the first place," Defendants still lack an Olmstead Plan. While EOHHS is in the process of developing an Olmstead Plan, it will not be presented to the Governor's Office until at least February 2025.

## CAUSES OF ACTION

### COUNT I – THE MEDICAID ACT

254. Plaintiffs adopt and restate the allegations set forth in paragraphs 1-253 of this Complaint.

255. Defendants have failed to provide or arrange medically necessary EPSDT behavioral and mental health services, including Intensive Home and Community-Based Services, for Plaintiffs and similarly situated youth, in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), and 1396d(r)(5), and 42 U.S.C. § 1983.

256. Defendants have violated the Reasonable Promptness provision of the Medicaid Act by failing to provide or arrange medically necessary EPSDT behavioral and mental health services, including Intensive Home and Community-Based Services, for Plaintiffs and similarly situated youth, with "reasonable promptness," in violation of 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. § 1983.

## COUNT II – ADA

257. Plaintiffs adopt and restate the allegations set forth in paragraphs 1-253 of this Complaint.

258. Defendants have failed to provide or arrange Intensive Home and Community-Based Services in the least restrictive environment appropriate to the needs of Plaintiffs and similarly situated youth, in violation of the ADA.

## COUNT III – SECTION 504

259. Plaintiffs adopt and restate the allegations set forth in paragraphs 1-253 of this Complaint.

260. Defendants have failed to provide or arrange Intensive Home and Community-Based Services in the least restrictive environment appropriate to the needs of Plaintiffs and similarly situated youth, in violation of Section 504 of the Rehabilitation Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

   a.    Assert subject matter jurisdiction over this action;

b.      Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure and appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

c.      Find that Defendants' conduct, as alleged herein, violates Plaintiffs' rights under: (i) the EPSDT and Reasonable Promptness Provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), 1396d(r), 1396a(a)(8), and § 1983; (ii) Title II of the ADA, 42 U.S.C. §§ 12101 *et seq.*; and (iii) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

d.      Grant permanent injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure, requiring Defendants to:

      i.     Establish and implement policies and practices to ensure the timely provision of Intensive Home and Community-Based mental and behavioral health Services—specifically Intensive Care Coordination, Intensive In-Home Services and Mobile Crisis Services—to the Named Plaintiffs and Class members;

      ii.    Promptly arrange for the Intensive Home and Community-Based Services for which the Named Plaintiffs and Class members are eligible;

      iii.   Establish and implement policies and practices to ensure that DCYF does not discriminate against the Named Plaintiffs and Class Members by placing them in restrictive settings apart from their communities and instead provides them Medicaid services in the most integrated setting appropriate to their needs; and

iv.  Establish and implement policies and practices that allow the Named

Plaintiffs and Class members to live and receive services in the most

integrated setting appropriate to meet their needs under Title II of the

ADA, 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the Rehabilitation

Act, 29 U.S.C. §§ 794 *et seq.*, and their implementing regulations,

including 28 C.F.R. § 35.130(b)(3) and 45 C.F.R. § 84.4(b).

e.  Retain jurisdiction over Defendants until such time as the Court is satisfied that

Defendants have implemented and sustained this injunctive relief;

f.  Award reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42

U.S.C. § 12205, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g.  Grant such further relief as the Court may deem just, necessary, and proper.


This 13th day of November 2024.          Respectfully submitted,

/s/ Kristine L. Sullivan
Kristine L. Sullivan, R.I. State Bar No. 10950
DISABILITY RIGHTS RHODE ISLAND
220 Toll Gate Road, Suite A
Warwick, RI 02886
Phone: (401) 831-3150
Fax: (401) 274-5568
Email: ksullivan@drri.org

/s/ Samantha Bartosz
Samantha Bartosz, I.L. State Bar No. 6194058
*Pro Hac Vice Admission Pending*
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York, NY 10005
Phone: (212) 683-2210
Email: sbartosz@childrensrights.org

/s/ Aarti Iyer
Aarti Iyer, N.Y. State Bar No. 5367578
*Pro Hac Vice Admission Pending*
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York, NY 10005
Phone: (212) 683-2210
Email: aiyer@childrensrights.org

/s/ Lynette Labinger
Lynette Labinger, R.I. State Bar No. 1645
COOPERATING COUNSEL, AMERICAN CIVIL
LIBERTIES UNION FOUNDATION OF RHODE
ISLAND
128 Dorrance St., Box 710
Providence, RI 02903
Phone: (401) 465-9565
Email: ll@labingerlaw.com